[No. A055409. First Dist., Div. Two. Apr. 29, 1993.]

JOHN L. WILSON et al., Plaintiffs and Appellants, v.
CENTURY 21 GREAT WESTERN REALTY et al., Defendants and
Respondents.

**COUNSEL**

Cain & Cain, Gene Cain and Stephen Austin Cain for Plaintiffs and Appellants.

Sher, Marshall, Akawie & Blumenfeld, Sher, Blumenfeld & O'Leary, Timothy F. O'Leary and Paul S. Lecky for Defendants and Respondents.

## OPINION

**SMITH, J.**—Plaintiffs John and Carolyne Wilson bought a home in Walnut Creek and later brought this action against the seller's real estate brokerage and agent, Century 21 Great Western Realty (Century 21) and Harry Kraft, after realizing that the home had foundation problems. The case was tried to a jury on theories of fraud, negligent misrepresentation and negligence, but the court granted a nonsuit at the close of evidence which left only the fraud cause of action. In a special verdict, the jury found that defendants had concealed or suppressed a material fact, but not with an intent to defraud. This appeal by plaintiffs from judgment on the verdict comes after the court denied their motions for new trial and judgment notwithstanding the verdict.

At issue here are the duties of a seller's broker to discover and disclose material defects to a home buyer, duties imposed by Civil Code sections 1102-1102.15, 2079 and 2079.2.[1] We affirm the judgment.

### BACKGROUND

■ A nonsuit is properly granted only if, as a matter of law, the evidence presented by the plaintiff is insufficient to permit a jury to find in his favor. Both the trial court and this court view the evidence most favorably to the plaintiff, with all legitimate inferences drawn in his favor and all supporting evidence accepted as true. (*Nally* v. *Grace Community Church* (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948]; *Campbell* v. *General Motors Corp.* (1982) 32 Cal.3d 112, 117-118 [184 Cal.Rptr. 891, 649 P.2d 224, 35 A.L.R.4th 1036]; *Marvin* v. *Adams* (1990) 224 Cal.App.3d 956, 960 [274 Cal.Rptr. 308].) From that perspective, we summarize the trial evidence.[2]

Ann Hays was the owner and sole occupant of the property, a small two-bedroom, cottage-style house on a large lot at 1096 Mountain View Blvd. The house was built about 1947 and had been ill maintained for years when the elderly Hays decided in early 1987 to sell. She and Century 21 agent Kraft first settled on a listing price of $159,500 but, after getting roof

---

[1]All section references herein are to the Civil Code unless otherwise stated.

[2]Plaintiffs fail to do this, thus ignoring our review standard and the rules of court. Instead of summarizing the material facts from trial (Cal. Rules of Court, rule 13), they recite only what their pleadings "alleged," as if no trial occurred. They also fail to include in their appendix some required documents like the judgment and notice of appeal. (*Id.*, rules 5.1(b) and 5(d).) Defendants accommodate us by providing a fact summary and, in a separate appendix, many of the omitted documents.

and termite inspection reports calling for a new roof and other repairs, listed it as a " 'fixer upper' " at an advertised reduced price of $149,950.[3]

Plaintiffs were looking for a house to fix up. John Wilson had a general contractor's license and about 12 years of experience in home construction, having done some remodeling and termite jobs but mostly new construction. Working with his own agent, a Robert Fitzstephens of MG Realty, John Wilson read the existing reports and personally inspected the property before making an offer. The termite report called for repairing water-related damage, mainly in the bathroom, and noted foundation and stucco cracks around the house. In a walk-through with Hays, Wilson saw obvious sloping of the floors, meaning they were out of level. Then in a later inspection conducted with his father (a contractor since 1952), Wilson checked under the house, where he saw a sump pump and examined the center piers to assure that the floors could be releveled. He felt that there was settling caused by water collecting under the house in the area of the pump. He decided that he could put in a perimeter drain, move the pump and relevel the floor. He then secured his own roof report, and it showed, contrary to the seller's, that the roof would not need replacing right away.

Also existing before the offer was the statutorily required form, "Real Estate Transfer Disclosure Statement" (§ 1102.6). In the seller's portion, Hays indicated that she was aware of defects in exterior walls and windows, explaining: "MINOR CRACKS IN STUCCO ON OUTSIDE WALLS. CRACK IN WINDOW IN MASTER BR." She also checked the "Yes" box opposite "Flooding, drainage or grading problems," explaining: "MINOR FLOODING IN LATE 1960's. DRAINAGE CORRECTED BY FLOOD CONTROL, SUMP PUMP INSTALLED UNDER HOUSE. NO FURTHER INCIDENTS OR PROBLEMS." In the listing agent's portion, Kraft confirmed Hays's information as complete and correct, by his own inspection, adding, "SEE ROOF AND TERMITE REPORTS." Neither portion indicated defects in the foundation.

Having that information, plaintiffs in late July 1987 made an offer of $140,000. The offer was made subject to their "physical inspection and acceptance" and "inspection and acceptance of existing termite and roof reports" within 10 days of contracting.

Hays counteroffered for $148,450, specifying: "THIS HOUSE IS BEING SOLD 'AS IS'. BUYER TO PAY FOR THE COST OF ALL REPAIRS." Buyers would also accept the existing reports and reimburse her for them.

---

[3]A "GOOD NEWS!" announcement prepared by Kraft stated in part: "The reports are in and there is roof and termite work that needs to be done. The 77 year old widow says 'Sell my home "as is." I don't want the hassle of fixing it up. I just want to sell so I can move closer to my family.' The price has been reduced to compensate for the work that needs to be done. Show to your 'fixer upper' buyers. Call listing agent for a copy of the roof and termite report."

Plaintiffs accepted, and John Wilson did the needed termite work himself pending escrow. That work was a condition of his lender, although the lender was satisfied with the independent report showing no immediate need to repair the roof. In the process of removing and replacing the bathroom subfloor, John got a view of the foundation in that area. A supplemental termite report at some point identified grading problems near the garage, and John's brother did the needed grading to correct them.

John testified that he did not see anything before the close of escrow which signaled structural problems. Plaintiffs removed and waived their "physical inspection" contingency on August 5, on the same day signing an acknowledgment that they knew they had the right to secure a property inspection report at their own expense. They never sought one. They testified that no one recommended having one done (there was contrary testimony that a specific structural engineer was recommended), although John knew they had the right to have a professional come in and inspect. Their own agent, Fitzstephens, executed the selling agent's portion of the disclosure form in September, writing: "Flooring and grading problems, refer to tradesman roof and termite reports."

Escrow closed in October, after plaintiffs on the first of that month conducted a final walk-through inspection and signed an inspection sheet stating that they accepted the property in its then-existing condition. They planned to fix the water and floor problems themselves and, eventually, add onto the house to accommodate their growing family.

This lawsuit concerns defendants' failure to act upon a brief conversation which Kraft had with Ann Hays's next-door neighbor, Jack Goldner, when the property was first listed for sale. Hays told Kraft that Goldner might be interested in buying, and Kraft approached him about it. Goldner said he might be interested and asked how much. When Kraft said $159,500, Goldner said it was too high and, having an ulterior motive of getting the price down, suggested that the property might have foundation problems.

Kraft and Goldner testified to somewhat differing accounts. We recite mostly Goldner's, which better supports plaintiffs' case: ". . . I told him that I thought that the house probably had some problems, that the price that he quoted me was higher than I expected the value of the house would be, if these problems were discovered. [¶] I told him, basically, that I was a contractor, that I was a home inspector, that I had had similar problems in my own house, had to replace my own foundation, having been a resident of the area for a number of years, had seen other people in the area that had to replace their foundations, and so I told him that if it [were] disclosed that

there were those problems in that house, I expected the value would come down. And at that time I'd be interested in taking a look at the possibility of purchasing the property . . . ." Goldner believed he also said that the problem homes had been built by the same builder as Hays's home. Goldner had extensively remodeled his own home, adding a second story, but Kraft recalled him saying that his home had been exactly the same as Hays's before the remodeling.

Goldner related his conversation with Kraft to John Wilson in early 1988, some three months after escrow had closed. Realizing that Wilson was a contractor too, Goldner gave him "a bit more elaborate" account than he had with Kraft. In December of that year, plaintiffs had a company X-ray their foundation, and the report revealed no steel reinforcement. John Wilson inspected for "J" bolts holding the house to the foundation and likewise found none.

Plaintiffs brought this action in January 1989. Their appeal is from the "judgment," suggesting the entire judgment. However, their arguments attack only the partial nonsuit ruling, which became reviewable only on appeal from the judgment entered on the subsequent no-fraud verdict. (Code Civ. Proc., § 581c, subd. (b).) The verdict itself is not challenged.

DISCUSSION

The trial court ruled, based on *Shapiro v. Hu* (1986) 188 Cal.App.3d 324 [233 Cal.Rptr. 470], that the "as is" feature of the sale in this case relieved defendants of liability except for the fraudulent nondisclosure cause of action—the intentional concealment of material defects not visible to or observable by plaintiffs.[4] We will uphold the ruling as correct in result.

■ "As is" language in a realty sales contract does not shield a seller or his agent from liability for affirmative or, as in this case, negative fraud. "[G]enerally speaking, such a provision means that the buyer takes the property in the condition visible to or observable by him. [Citation.] Where the seller actively misrepresents the then condition of the property [citations] or fails to disclose the true facts of its condition not within the buyer's reach and affecting the value or desirability of the property, an 'as is' provision is ineffective to relieve the seller of either his 'affirmative' or 'negative'

---

[4]Explaining to jurors the sudden disappearance of two causes of action, the court instructed: "Any sale of real property quote 'as is' unquote is a sale of the property in its present or existing condition, relieving the seller's agents from liability for negligence or negligent misrepresentation. [¶] Except that a seller's agent is not relieved from liability where said agent through fraud or deceit intentionally conceals material defects not otherwise visible or observable to the buyer."

fraud. . . . To enlarge the meaning of such a provision so as to make it operative against all charges of fraud would be to permit the seller to contract against his own fraud contrary to . . . law. (Civ. Code, § 1668.)"[5] (*Lingsch* v. *Savage* (1963) 213 Cal.App.2d 729, 742 [29 Cal.Rptr. 201, 8 A.L.R.3d 537]; see 1 Miller & Starr, Cal. Real Estate (2d ed. 1989) § 1:127, p. 446.)

### Fraudulent nondisclosure

Consistent with the foregoing, the court here allowed the jury to determine plaintiffs' cause of action for "negative" fraud—defendants' alleged nondisclosure of a fact materially affecting the value or desirability of the property. The basis was statutory. While Kraft did not *know* from his conversation with Goldner that Hays's foundation had defects, he assertedly should have investigated further and then discovered defects and disclosed them. Section 2079 requires a broker "to conduct a reasonably competent and diligent visual inspection of the property offered for sale and to disclose to that prospective purchaser all facts materially affecting the value or desirability of the property that such an investigation would reveal . . . ." The standard of care is what a reasonably prudent real estate licensee would exercise (§ 2079.2), and disclosure is required on the form used in this case (§§ 1102, 1102.6).

### Negligent misrepresentation

■ Plaintiffs observe that negligent misrepresentation, one of their nonsuited causes of action, is construed in this state as a species of fraud or deceit, responsibility for which therefore cannot be validly contracted away without violating public policy as expressed in section 1668 (see fn. 4, *ante*). (*Blankenheim* v. *E. F. Hutton & Co.* (1990) 217 Cal.App.3d 1463, 1471-1473 [266 Cal.Rptr. 593]; *Continental Airlines, Inc.* v. *McDonnell Douglas Corp.* (1989) 216 Cal.App.3d 388, 402-404 [264 Cal.Rptr. 779].) They urge that the court accordingly should have let that cause of action go to the jury despite the "as is" provision.

However, assuming merit in that argument, defendants offer a different basis for upholding the nonsuit. ■ "[G]rounds not specified in a motion for nonsuit will be considered by an appellate court only if it is clear that the defect is one which could not have been remedied had it been called to the attention of plaintiff by the motion. . . ." (*Lawless* v. *Calaway* (1944) 24

---

[5] "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." (§ 1668.)

Cal.2d 81, 94 [147 P.2d 604].) Here, the motion was brought not at the close of plaintiffs' case-in-chief, but at the close of *all* evidence. We may assume, therefore, that plaintiffs had presented all the evidence they had to offer. Plaintiffs do not argue otherwise.

■ Negligent misrepresentation is a species of fraud or deceit specifically requiring a "positive assertion" (§ 1572, subd. 2) or "assertion" (§ 1710, subd. 2) of fact. (*Blankenheim v. E. F. Hutton & Co., supra,* 217 Cal.App.3d 1463, 1472-1473 & fn. 6.) An "implied" assertion or representation is not enough. (*Byrum v. Brand* (1990) 219 Cal.App.3d 926, 942 [268 Cal.Rptr. 609]; see *Huber, Hunt & Nichols, Inc. v. Moore* (1977) 67 Cal.App.3d 278, 304 [136 Cal.Rptr. 603].)

Defendants urge that the evidence does not show an adequate "assertion." We agree. In remarks to the court on the nonsuit motion, plaintiffs' counsel cited three asserted misrepresentations: (1) the fixer-upper language in the "GOOD NEWS!" announcement prepared by Kraft, (2) the "no" box being checked where the disclosure form asks whether the seller is aware of "Any settling from any cause, or slippage, sliding, or other soil problems," and (3) no check being made in the box indicating the seller's awareness of "any significant defects/ malfunctions" in the "Foundation."

The first is easily dispatched. Asserting that property is good for " 'fixer upper' buyers" (fn. 3, *ante*) does not even impliedly represent the condition of the foundation. The foundation may be part of what needs fixing up. The second—the "no" box about awareness of settling, or slippage, sliding or other soil problems—relates to "settling" or "soil" problems, not the foundation itself. Reference to the foundation is implied at best, not a positive assertion. It follows that Kraft did not positively assert anything about the foundation when he attested that the seller's information was complete and correct to the best of his knowledge. Finally, asserting that one is not "aware" of significant "defects/malfunctions" in a foundation, while a direct reference to a foundation, is still only *implied* as to its true condition. Indeed, one who claims to be "aware" of no defects necessarily leaves open the chance that unknown defects do exist. While plaintiffs argue that failure to discover and disclose unknown defects renders a disclosure of known defects an adequate implied "assertion," one court has held, in the analogous context of an investment advisor's failure to investigate and disclose investment facts, that the positive-assertion requirement bars relief. (*Byrum v. Brand, supra,* 219 Cal.App.3d 926, 942.) Here, as there, "[t]he alleged representation by omission . . . seems to us to be too remote to fit this requirement. . . ." (*Ibid.*)

Because lack of a positive "assertion" defeats the claim, we do not consider whether jurors, having found no intent to defraud would, as defendants suggest, have found no intent to induce reliance, another essential

element of negligent misrepresentation. (*Continental Airlines, Inc.* v. *McDonnell Douglas Corp.*, *supra*, 216 Cal.App.3d 388, 402.)

*Negligence*

■ That leaves the claim for ordinary negligence, and it appears to be an open question whether an "as is" provision in a realty sales contract validly relieves a broker of negligence liability for failure to discharge inspect-and-disclose duties owed to a buyer under section 2079 (see also § 1102 et seq.). We need not decide that question as the evidence here does not show a breach of statutory obligations.

A broker's duty to both *inspect* and disclose was first articulated in *Easton* v. *Strassburger* (1984) 152 Cal.App.3d 90 [199 Cal.Rptr. 383, 46 A.L.R.4th 521], a decision from this court, and was a common law development: "[T]he duty of a real estate broker, representing the seller, to disclose facts . . . includes the affirmative duty to conduct a reasonably competent and diligent inspection of the residential property listed for sale and to disclose to prospective purchasers all facts materially affecting the value or desirability of the property that such an investigation would reveal." (*Id.*, at p. 102, fn. omitted.) The Legislature, as part of a scheme also including seller-disclosure duties (§ 1102 et seq.), has now codified that duty, with modifications. Section 2079 requires a broker to "conduct a reasonably competent and diligent visual inspection" of the property and "disclose to [a] prospective purchaser all facts materially affecting the value or desirability of the property that such an investigation would reveal . . . ."[6]

It is not clear whether the broker's statutory duties supplant case law duties (cf. § 1102.8 [duties required by that article, §§ 1102-1102.15, do not limit or abridge those created by any other provision of law]), but plaintiffs base their case here exclusively on the statute. Their main argument that the "as is" provision had no effect, in fact, is that the law does not allow parties to contract away ordinary negligence liability for breach of duties created *by statute* for the public interest. (§§ 3513, 1668; see 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, §§ 631, 645, pp. 568-569, 586.)

---

[6]Section 2079 states in full: "It is the duty of a real estate broker, licensed under the provisions of Division 4 (commencing with Section 10000) of the Business and Professions Code, to a prospective purchaser of residential real property comprising one to four dwelling units, including a manufactured home as defined in Section 18007 of the Health and Safety Code, to conduct a reasonably competent and diligent visual inspection of the property offered for sale and to disclose to that prospective purchaser all facts materially affecting the value or desirability of the property that such an investigation would reveal, if that broker has a written contract with the seller to find or obtain a buyer or is a broker who acts in cooperation with such a broker to find and obtain a buyer."

Plaintiffs fail to read the statute carefully enough. They base their case on a claimed duty by Kraft to investigate the foundation, based on the neighbor's comments, to discover defects (the absence of steel reinforcement and "J" bolts) and then to disclose those defects to plaintiffs. The statute does not require that kind of investigation and disclosure. Section 2079 requires a reasonably competent and diligent "visual" inspection and disclosure of any material defects which "such an investigation" would reveal (fn. 6, *ante*). The "inspection to be performed" under that provision, moreover, "does not include or involve an inspection of areas that are reasonably and normally inaccessible to such an inspection . . . ." (§ 2079.3.)

Uncontradicted evidence shows that the only *visually* apparent problems with the foundation were some cracks and that those were disclosed both in the termite repair report and by plaintiffs' own repeated inspections of the property. Uneven flooring, which might also suggest foundation deficiencies, was obvious, was noted by plaintiffs' own agent on the disclosure form and was personally observed by plaintiffs. Nothing in the statutes required Kraft to order an X-ray (radiograph) examination for steel. Lack of steel was undisputedly hidden to the eye; only radiograph tests revealed it. Similarly, John Wilson testified that he discovered a lack of "J" bolts only by fishing around under the house between the foundation concrete and some concealing wood with a flat steel bar. He stated: "the way it was constructed, they were hidden"; "you couldn't tell whether there [were any]"; "[i]t was just covered up." Thus the record conclusively establishes that the structural defects were not discernible by "visual inspection" (§ 2079) and involved areas which were "reasonably and normally inaccessible to such an inspection" (§ 2079.3).

Nor did Goldner's conversation with Kraft reveal such problems. Goldner spoke generally about *probable* problems, not knowing whether Hays's house in fact had them, and he did not, according to both his and Kraft's testimony, speak of steel reinforcement or "J" bolts. If he mentioned them at all, it was to John Wilson, after the sale, where Goldner was "a bit more elaborate" because he was speaking with a fellow contractor.

No statutory duty was breached.

Our decision in *Easton v. Strassburger, supra,* 152 Cal.App.3d 90, likewise offers no common law support for the intrusive, speculation-based duty of inspection and disclosure urged upon us here. At issue in *Easton* was failure to discover soils problems, but not problems discernible only by a soils engineer or other expert. The seller's agents had been aware of certain "'red flags'" which indicated erosion or settlement problems, and a reasonable inquiry would have revealed *actual* problems of that kind *on the sold*

*property* in the recent past, including massive earth movement. (*Id.*, at pp. 96, 104.)

Nonsuit was proper.

## DISPOSITION

The judgment is affirmed.

Kline, P. J., and Benson, J., concurred.

A petition for a rehearing was denied June 1, 1993, and appellants' petition for review by the Supreme Court was denied July 22, 1993.