[No. D008825. Fourth Dist., Div. One. Apr. 20, 1990.]

GEORGE L. BYRUM et al., Plaintiffs and Appellants, v.
RICHARD GARTH BRAND, Defendant and Respondent.

**COUNSEL**

Sternberg, Eggers, Kidder & Fox, Jerome E. Eggers, Jeanne E. Courtney and Christopher E. McAteer for Plaintiffs and Appellants.

Chapin, Brewer & Winet and Robert S. Brewer, Jr., for Defendant and Respondent.

**OPINION**

**HUFFMAN, J.**—Plaintiffs George L. Byrum and J. Virginia Byrum (collectively, Byrum) appeal a judgment entered on a defense verdict in favor of Richard Garth Brand after jury trial was held in Byrum's action for fraud, negligent misrepresentation, and breach of fiduciary duty. Byrum raises claims of instructional error concerning (1) the nature of the representations or omissions which are properly actionable under a theory of negligent misrepresentation, (2) the duties and burden of proof applicable to an "investment adviser" within the meaning of certain provisions of the Corporations Code and the Civil Code,[1] and (3) the effect of a judicial admission contained in Brand's answer. Further, Byrum contends he was prejudiced by the use of a special verdict form for the breach of fiduciary duty cause of action which he claims was contrary to that approved by stipulation of the parties and was in any case contrary to law, and moreover that certain special verdicts reached by the jury were inconsistent, improper, and contrary to the evidence.

We do not find the claims of instructional and other error to be well taken, with the exception that we conclude the special verdict form used for the cause of action for breach of fiduciary duty contained an incorrect statement of law and its use significantly prejudiced Byrum. Accordingly, we reverse the judgment entered on the special verdict on the breach of fiduciary duty claim alone, and affirm the judgment with respect to the causes of action for fraud and negligent misrepresentation.

### FACTUAL AND PROCEDURAL BACKGROUND

Byrum retired from his prosperous electrical contracting business in 1982. He had met Brand through a mutual friend in late 1979 or early 1980

---

[1] These provisions are found in Corporations Code section 25009 and Civil Code section 3372.

All statutory references are to the Civil Code unless otherwise specified."

when he asked the friend to suggest someone he could talk to in a business capacity about a tax problem at Byrum's business, Atlas Electric.[2] Byrum testified at trial he wanted to see Brand, whom he understood to be a financial adviser, to get unbiased advice regarding his selection of investments for his business and for his retirement; Byrum was preparing for retirement by making plans to turn his business over to an employee. He offered to pay Brand an hourly fee for services but Brand told him that would not be necessary, as everything he did would be taken care of by commissions.

Byrum told Brand he wanted to arrange a tax shelter investment. At the time, Byrum had no other investment consultant. Brand arranged for Atlas Electric's stock portfolio to be managed by an investment management company (Intervest) and set up tax shelter investments in two businesses, Atlantis Leasing and a limited partnership named North Oaks. Each of these ventures was successful and by late 1980 and early 1981, Byrum had developed trust in Brand's financial expertise. However, Byrum was never asked by Brand for personal financial data such as financial statements or estate planning documents such as his will, nor was their arrangement for financial advising for either Byrum or his business ever formalized in a contract or letter.

Brand testified he has been a certified financial planner since the mid-1970's and also holds a real estate license and is a registered representative and stockbroker. In explaining his professional qualifications and experience to the jury, Brand stated he as a broker was compensated for his services by a commission paid by both buyer and seller of stock in such transactions as the Intervest portfolio management which he set up. Similarly, where limited partnership investments were concerned, Brand was compensated by the syndicator of the investment for bringing investors into the deal. However, with respect to the investment which gave rise to this action, the "Hilo investment," Brand testified he received no commissions for obtaining investors' participation and was an investor himself. Although he was questioned at trial about the federal requirements for acting as an "investment adviser," he did not characterize himself as such at the time he dealt with Byrum.[3]

Brand testified Byrum originally consulted him to have individual investments brought to Byrum's attention, and to obtain information about tax incentive-type investments. He considered Byrum to be a sophisticated

---

[2] Mrs. Byrum, the coplaintiff in this action, did not participate in her husband's investment activities.

[3] He has since left the business of financial planning and is now a registered investment adviser.

investor based on Byrum's experience of 15 years' investing on behalf of his business, Atlas Electric, using corporations formed for that purpose. At their initial meeting, they discussed tax shelters. Brand testified at trial that in a loose sense, he had acted as Byrum's financial planner, but, in his mind, that term was equivalent to other names for that occupation such as stockbroker, registered representative, or financial consultant. He testified his relationship with Byrum was "to act as a stock broker or a registered representative in which I would recommend various investments as options to Mr. Byrum to see if they agreed with his investment goals and his level of risk." He did not consider himself to be a personal financial consultant to Byrum; if he had, he would have needed to obtain information on Byrum's will, trusts, insurance, assets, and liabilities, which he never did.

After Byrum had invested in several concerns on Brand's advice, Brand presented him with a proposal for the Hilo investment for his personal consideration. This investment was a Hawaiian land trust in which Byrum bought a 20 percent interest for $70,000, payable with a $14,000 down payment and the balance due by November 1, 1989, in quarterly payments at 10 percent interest. Both Brand and his son, Richard Stephen Brand (referred to at trial as Rick Brand), testified extensively about the Hilo investment. Rick Brand bought the 39-acre parcel of rural Hilo property in 1979 for $225,000 ($5,800 per acre), with a $20,000 down payment, for the purpose of subdividing it into 6 parcels of vacant but improved land.[4] His only prior experience in the real estate business had been fixing up a house in Leucadia, California, for resale at a profit.

In 1980, having unsuccessfully attempted to sell the property and having cash flow problems, Rick Brand asked his father to find investors in the project, as Brand had offered to do after visiting the site. Brand testified he asked a few people he thought were his friends if they wanted to participate in the project, which he felt was a "medium risk investment." He prepared a packet of information on the land which included maps listing recent prices of subdivided parcels in the area, a list of neighboring property owners, a summary of information and a list of "interesting facts" on land in Hilo, and a table entitled, "Ten Percent Inflation Appreciation Factor," which covered a period up until 1984. Brand testified this packet did not contain, nor did he tell the investors, any estimate of the risk involved in the investment, the cost of improvements necessary to subdivide the land, a list of the required improvements such as drainage or road upgrading, the price his son had paid for the land or how title was held, nor an account of his son's employment history. However, he did tell the investors they would be

---

[4] Rick Brand bought an interest in the land sale contract entered into by the prior owner, as allowed by Hawaii law. He thus did not hold free title but had the right to improve the land.

buying a beneficial interest in the land as tenants in the entirety, and they would be assessed for the costs of improvements to the land, such as the road upgrading. The price to the investors was approximately $9,000 per acre, and the investors trusted him that this was a fair market value.

With regard to his dealings with Byrum, Brand denied ever telling Byrum a time frame for the investment, such as five years, or intentionally misrepresenting or concealing any facts. He also said he could not recall telling Byrum he would not have invested in the project if his son Rick had not been involved (although at an earlier deposition he had said this), but denied that this occurred. Brand said the first time he learned Byrum's investments were made with his retirement in mind was at trial. He did tell Byrum his son Rick would oversee the progress of the project, although these duties were voluntary on Rick's part.

Brand testified he informed Byrum of all the risks of which he was aware and all the factors which he felt were pertinent to the making of an informed decision. In his view, he did not have the duty to tell the investors what he did not know, and neither he nor Rick knew the costs of improving the road or bringing in electrical power, nor the length of time it would take to complete the proposed subdivision; they merely believed the project was economically feasible. However, he had a general estimate at the time that the worst case for bearing the carrying costs would be until 1989, when the original note on the property expired.

Not surprisingly, Byrum's testimony differed from Brand's account of things. Byrum told the jury Brand had told him Rick Brand worked in real estate in Hawaii and would be there to manage the property. Brand told Byrum at their original meeting about the Hilo investment that the road was suitable for an agricultural subdivision and would not need to be improved and that neither water nor sewer service would have to be provided, although electrical power would have to be brought in. He made no independent investigation of the property, instead relying on Brand's representations about the project.

Although Byrum did not inquire of Brand about the completion date of the project, and although Brand did not expressly state the project would be completed by 1984, Byrum understood that since the "Ten Percent Inflation Appreciation Factor" document provided in the information packet did not go beyond 1984, the project would be completed by that year. Byrum testified he was never told the following pertinent factors about the project: Rick Brand had no experience in land development, a two-mile stretch of road would have to be improved with the cooperation of neighboring landowners, drainage was required to be installed, the property had

been on the market for six months in 1980 without any offers having been made, and Rick had bought the property for $5,800 per acre. At his first meeting with Brand, he was not told about the carrying costs for the property or that Rick Brand did not have free title to the property. Byrum testified he would not have invested in the project if he had known then what he knew now.

In addition to Byrum and Brand, Rick Brand and several other investors testified at trial about what information regarding the project was known to them and when. Rick Brand testified he never told his father any estimated completion date for the project or that the participation of the neighbors in the road improvement was essential, although it would have made the road construction cheaper.

After the investors received a bill in the summer of 1985 for $69,000 road engineering fees, Byrum decided the delay in the project had lasted too long and the costs were too high. He offered to sell his interest in the property to the other investors but did not get any immediate takers. Having made some inquiries of Rick Brand, starting in March 1983 about projected development costs and not being satisfied with the answers, Byrum "lost faith" in Rick in July 1985 and stopped making payments on the promissory note he had signed in connection with the investment. Rick Brand then sued Byrum in Hawaii to foreclose his interest in the property and for damages. That action was settled in return for Byrum's release of all interest in the land, after Byrum incurred $12,176.63 attorney's fees defending the action; the other investors assumed his share of the obligation. The improved road was laid in 1986-1987, and the property was on the market at the time of trial.

Byrum's complaint (later amended)[5] was filed against Brand on July 20, 1987, for fraud, negligent misrepresentation, and breach of fiduciary duty. He sought damages of $83,226.72, exemplary damages of $500,000 and related relief. Brand answered, denying the major allegations, but in paragraph 4 of his answer admitted he "[held] himself out to the public as providing sound investment advice to his clients."

The matter proceeded to jury trial in July 1988. The trial court refused to give several jury instructions requested by Byrum. The first instruction

---

[5] By motion set for July 13, 1988, Byrum sought leave of court to further amend the complaint to add allegations that the Hilo investment was a security and to add other allegations about the claimed misrepresentations. This motion was taken off calendar by the judge who conducted a de novo settlement conference as violative of local rules generally prohibiting the bringing of a motion to amend after arbitration was held, as we have established by taking judicial notice of the superior court file. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

denied was a specially tailored instruction on the issues of the elements of negligent misrepresentation; however, the court did give the jury a pattern instruction on negligent misrepresentation, BAJI No. 12.45 (7th ed. 1986).[6] Second, Byrum requested and the court refused to give several proposed instructions on the definition, duty, and burden of proof applicable to an "investment adviser," drawn from Corporations Code sections 25002 and 25009 as well as Civil Code section 3372. The court refused to instruct the jury that judicial notice had been taken that the investment involved was a "security," and explained that an exception in Corporations Code section 25009 (in the securities law) applied, in that Brand qualified as a broker-dealer who received no special compensation for his services.

With regard to the instruction requested under section 3372, the court denied plaintiff's request that it be given "because I think that it is clear from the evidence that Mr. Byrum did not use Mr. Brand for his retirement plan. He wanted tax shelters and he wanted investments and the investments that were suggested to Mr. Byrum by Mr. Brand were not of the securities-type, or of the type that would fall within the Corporations or Securities Codes." The court also refused Byrum's proposed instruction about the effect of admitted allegations in the pleadings. However, pursuant to stipulation of the parties that Brand owed Byrum a fiduciary duty by virtue of his advisory capacity, the court accordingly instructed the jury Brand had a duty of full and complete disclosure of all material facts with respect to the Hilo investment. The "material facts" were defined as those that were significant to Byrum's decision to invest, regarding the scope, cost, timing, and/or necessity of third party contributions to the project.

The jury returned a defense verdict including special verdicts on each cause of action. As to the claim of negligent misrepresentation, the jury answered "no" to the question: "In the course of his representation to plaintiffs about the Hilo investment, did the defendant make a representation of a past or existing material fact that was untrue?"

As to the fraud cause of action, the jury was asked and answered as follows:

"Question No. 1: Did the defendant conceal, suppress or misrepresent a material fact in the course of his representation to plaintiffs about the Hilo investment? Answer: Yes.

"Question No. 2: Did the defendant conceal, suppress or misrepresent a material fact with the intention to induce plaintiffs to invest in the Hilo investment? Answer: No."

---

[6] All BAJI instructions referred to are from the seventh edition (1986) unless otherwise noted.

As to the cause of action for breach of fiduciary duty, a stipulation was reached as to the form of a special verdict to be used. Brand's attorney volunteered to prepare the entire special verdict form for the jury's use during deliberations and brought it to court the next day. Counsel for plaintiff received it and made some limited review of all the papers without raising any objections at trial. The jury then answered "no" to the verdict's question regarding breach of fiduciary duty: "Did the defendant intentionally fail to disclose to plaintiffs any material fact known by him which should have been disclosed because of their confidential relationship?"

After judgment was entered on the defense verdict, Byrum brought a new trial motion on a number of grounds, alleging in part that the special verdict form used for the breach of fiduciary duty cause of action was contrary to the parties' agreement and contrary to law. The motion for new trial was supported and opposed by the respective declarations of counsel. The court denied the motion, stating that while there might have been a misunderstanding, it did not find any ethical violation by counsel or any change in the verdict form as agreed. Byrum timely appealed.

## DISCUSSION

Byrum raises a number of claims of error in the proceedings below. He chiefly focuses on instructional error that he contends occurred on the cause of action for negligent misrepresentation regarding the nature of the representation or omission required. He also claims instructional error occurred with respect to all the causes of action (negligent misrepresentation, fraud and breach of fiduciary duty) based on evidence that Brand had acted as Byrum's "financial planner" or "financial consultant," and had admitted in his answer that he "[held] himself out to the public as providing sound investment advice to his clients." Byrum thus contends the court erred in refusing his requested instructions about the definition and special duties of an "investment adviser," about shifting the burden of proof to Brand in accordance with section 3372, and about the effect of a judicial admission such as Brand made in his answer.

In addition to claiming instructional error, Byrum contends prejudicial error occurred when the trial court allowed a special verdict form on the cause of action for breach of fiduciary duty to be submitted to the jury in a form other than that agreed upon by counsel, and in a form which contained an incorrect statement of law regarding the intent required on the part of Brand. He also argues the defense verdict rendered on breach of fiduciary duty was inconsistent with the jury's findings on a related issue (i.e., fraud, that Brand had concealed, suppressed, or misrepresented a material fact about the Hilo investment, although this was not found to

have been done with the intention to induce Byrum to make the investment), and was inconsistent with the stipulation of the parties and instruction by the court that Brand had a fiduciary relationship with Byrum. Finally, Byrum challenges the sufficiency of the evidence to support the defense verdict on fraud and its finding that Brand had not intended to induce Byrum to invest when making the representations that he did about the Hilo investment.

We requested supplemental briefing from the parties about the claimed instructional error regarding the special duties of an "investment adviser," and whether the Corporate Securities Law of 1968 (Corp. Code, § 25000 et seq.) and Civil Code section 3372 are properly applicable to these facts. We have considered all the materials submitted and do not find any of the claims of instructional error justify reversal of the judgment, for the reasons to be explained. However, since the version of the special verdict form submitted to the jury incorrectly required it to make an express finding of intent that Brand *"intentionally* fail[ed] to disclose to [Byrum] any material fact known by him which should have been disclosed because of their confidential relationship" (italics added), and accordingly required Byrum to make a greater showing of breach of fiduciary duty than is required by existing law, this was prejudicial error requiring reversal of the judgment on the breach of fiduciary duty theory alone. We shall discuss this dispositive issue first and then turn to the claims of instructional error and remaining contentions.

I

Breach of Fiduciary Duty: Special Verdict Form

We first address Byrum's contention he is entitled to relief from the judgment on breach of fiduciary duty because the form of verdict used was allegedly contrary to the form agreed upon by counsel, as claimed in the motion for new trial. In denying that motion, the trial court made no explicit findings that any waiver of the defect had occurred when Byrum's attorney received and reviewed the forms before the court sent them to the jury. Instead, the court admitted there might have been a misunderstanding, but it did not believe any change from the stipulated format was reflected in the final version used.

The Supreme Court addressed this problem in *Woodcock v. Fontana Scaffolding & Equip. Co.* (1968) 69 Cal.2d 452, 456-457, footnote 2 [72 Cal.Rptr. 217, 445 P.2d 881]. First noting that failure to object to the form of a verdict before the jury has been discharged has frequently been held to be a waiver of any defect, the court stated there are many exceptions to this

rule. (*Ibid.*) For example, "[w]aiver is not found where the record indicates that the failure to object was not the result of a desire to reap a 'technical advantage' or engage in a 'litigious strategy.' [Citations.]" (*Ibid.*) Waiver should not be found where a defect is latent and there is no hint of a strategic motive (as where a mistake has been made). The record before us gives rise only to inferences that a mistake was made, for whatever reason, and we shall not decide this issue on the basis of waiver. Instead, we shall examine the special verdict form for its legal sufficiency.

Byrum's claim for breach of fiduciary duty alleged that duty was breached by reason of Brand's alleged fraud. Pursuant to stipulation of the parties, the jury was instructed a fiduciary, such as Brand, had a duty of full and complete disclosure of all the material facts he knew about the investment before obtaining Byrum's consent to the transaction. The jury was told, in pertinent part, "If you find by a preponderance of the evidence of the evidence [*sic*] that the defendant failed to disclose a material fact which he knew, then, you may award damages for breach of that duty." Related instructions were then given regarding the negligent misrepresentation cause of action about the requirement for a finding of liability that Brand have made an untrue representation as to a past or existing material fact, regardless of his actual belief about the truth of the fact, if there were no reasonable ground for believing it to be true.

 The statute which governs claims of breach of fiduciary duty is section 1573, which provides: "CONSTRUCTIVE FRAUD. Constructive fraud consists: [¶] 1. In any breach of duty which, *without an actually fraudulent intent,* gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him; or, [¶] 2. In any such act or omission as the law specially declares to be fraudulent, *without respect to actual fraud.* " (Italics added.)

The Supreme Court interpreted section 1573 in *Mary Pickford Co.* v. *Bayly Bros., Inc.* (1939) 12 Cal.2d 501, 525 [86 P.2d 102], as stating the rule applicable in confidential relations. The court explained it is essential to the operation of the principle of constructive fraud that there exist a fiduciary relation, and stated: " 'To constitute positive or actual fraud there must be such fraud as affects the conscience, that is, there must be an intentional deception. Constructive fraud, on the other hand, is presumed from the relation of the parties to a transaction, or the circumstances under which it takes place. . . . Constructive fraud often exists where the parties to a contract have a special confidential or fiduciary relation . . . .' [Citation.]"

The breach of duty referred to in section 1573 must be one created by the confidential relationship, which is one of the facts constituting the fraud.

(*Guthrie* v. *Times-Mirror Co.* (1975) 51 Cal.App.3d 879, 889 [124 Cal.Rptr. 577]; also see *Main* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1977) 67 Cal.App.3d 19, 32-33 [136 Cal.Rptr. 378].) This distinguishes constructive fraud from other forms of actual fraud, including negligent misrepresentation, which may occur in any type of relationship. (§§ 1572, subd. (2), 1709, 1710, subd. (2); cf. *Hayter* v. *Fulmor* (1949) 92 Cal.App.2d 392, 398 [206 P.2d 1101], disapproved on another point in *Gagne* v. *Bertran* (1954) 43 Cal.2d 481, 488, fn. 5 [275 P.2d 15].) It is clear that " '[c]onstructive fraud exists in cases in which conduct, although not actually fraudulent, ought to be so treated—that is, in which such conduct is a constructive or quasi fraud, having all the actual consequences and all the legal effects of actual fraud. [Citations.]' " (*Efron* v. *Kalmanovitz* (1964) 226 Cal.App.2d 546, 560 [38 Cal.Rptr. 148].)[7]

With respect to this theory, breach of fiduciary duty or constructive fraud, Witkin has helpfully observed that where nondisclosure is alleged, the elements of representation and falsity—always part of a cause of action for actual fraud—are absent, as "[t]he fraud consists of the breach of the fiduciary duty of disclosure of relevant matters arising from the relationship, and this must be alleged. [Citation.]" (5 Witkin, Cal. Procedure, Pleading, *op. cit. supra*, at p. 117.)

 From the above authorities, it is readily seen that since fraud may be *presumed* from the parties' confidential relationship or the circumstances of their dealings, the special verdict here, requiring a finding of Brand's *intentional* failure to disclose material facts that should have been disclosed by virtue of the confidential relationship, was an incorrect statement of the law and could more probably than not have served to confuse and mislead the jury. This verdict form was impermissibly contrary to the instructions given with respect to the breach of fiduciary duty theory which did not require an intent to fail to disclose material facts. (*Koebig* v. *Southern Pacific Co.* (1895) 108 Cal. 235, 239-240 [41 P. 469]; see 9 Witkin, Cal.

---

[7] We note that commentators are not in agreement as to whether intent to deceive must be specifically alleged in causes of action for constructive fraud. Witkin in 5 California Procedure (3d ed. 1985) Pleading, section 666, at page 117, concludes without citation of authority: "It would seem that intent to deceive is part of the tort cause of action even for constructive fraud and, if so, it should be alleged, presumably in the same manner as in cases of actual fraud." The authors of 34 California Jurisprudence (3d ed. 1977) Fraud and Deceit, section 72, at page 710, conversely state: "Of course, in charging constructive fraud arising from the relationship of the parties without reference to intent, it is not necessary to allege intent specifically, but the facts constituting the fraud must be alleged, and from these the fraud may be inferred. [Fn. omitted.]" We are not dealing here with a pleading question, and need not resolve this dispute; however, for our purposes of analyzing the sufficiency of the special verdict form, we believe the California Jurisprudence approach more closely follows the language of section 1573, the controlling statute.

Procedure, *op. cit. supra*, Appeal, § 356, p. 360.) It was thus improper and likely served to prejudice Byrum's claim on this issue.

Our examination of the verdict forms in their entirety convinces us the only proper disposition of this matter is an open reversal on the breach of fiduciary duty theory. The relationship of the fraud-based theories and verdicts with the fiduciary duty verdict does not give any clear indication of what the jury would have decided had a correct verdict form been supplied to them on this issue. The reversal we order puts the case "at large," as if no trial had ever taken place. (See 9 Witkin, Cal. Procedure, *op. cit. supra*, Appeal, § 625, at pp. 606-607.) Accordingly, the parties may seek leave of court to amend their pleadings for retrial (*op. cit. supra*, § 627, at pp. 608-609); the evidence presented and stipulations reached at retrial may differ from the original. We turn to the remaining issues raised on appeal with these considerations in mind.

II

Instructional Error and Remaining Claim

We set forth established rules for evaluating claims of instructional error.

■ "Refusal to give a requested instruction is reversible error where the omission misleads and confuses the jury and it is reasonably probable a result more favorable to the requesting party would have been reached in the absence of the error. [Citations.]" (*Canavin* v. *Pacific Southwest Airlines* (1983) 148 Cal.App.3d 512, 523-524 [196 Cal.Rptr. 82].)

■ It is also well settled a party has the right to have the jury instructed on his or her theory of the case, but has no right to require the court use any particular phraseology; as long as the court correctly instructs on the issue, it is free to modify an instruction or give one of its own in lieu of the one offered. (*Grimshaw* v. *Ford Motor Co.* (1981) 119 Cal.App.3d 757, 805 [174 Cal.Rptr. 348]; also see 9 Witkin, Cal. Procedure, *op. cit. supra*, Appeal, § 355, pp. 358-359.) The appellate court must examine all the circumstances of the case, including the evidence and the other instructions given, in order to determine whether the probable effect of specific instructions has been to mislead the jury and thus to prejudice a party. (*Henderson* v. *Harnischfeger Corp.* (1974) 12 Cal.3d 663, 670-671 [117 Cal.Rptr. 1, 527 P.2d 353].)

In light of the reversal ordered on the breach of fiduciary duty cause of action, our observations on instructional error as to that theory are necessarily limited, since we have no way of knowing what the state of the evidence and pleadings will be at retrial. However, to fully consider the

validity of the judgment entered on the defense verdicts on negligent misrepresentation and fraud, we discuss each of Byrum's claims of instructional error, and in conclusion consider his attack on the evidence supporting the judgment on the fraud cause of action.

## A

### Negligent Misrepresentation

■ Byrum sought to have the trial court instruct the jury on the elements of negligent misrepresentation in a modified version of California Forms of Jury Instruction (Matthew Bender rev. ed. 1989), section 43.05. In pertinent part (the element of representation) that proposed instruction read: "Defendant is liable to Plaintiff for damages for negligent misrepresentation if Plaintiff proves the following: [¶] 1. That Defendant represented to Plaintiff that [the investment was in his interest by failing to disclose material facts which if known would have resulted in plaintiff's not investing]."

The trial court declined to give this instruction, instead giving BAJI No. 12.45, which stated simply as to the representation element: "The defendant must have made a representation as to a past or existing material fact."

Byrum contends this refusal to instruct as requested was prejudicial error. His theory is that negligent misrepresentation may be shown where a fiduciary fails or omits to disclose certain material facts, as well as where the fiduciary negligently makes "positive assertions" (§ 1572, subd. (2)) or "assertions" (§ 1710, subd. (2)) of facts with no reasonable basis for belief that the facts are true.[8] While he admits to finding no California authority which describes negligent misrepresentation by omission where a special (fiduciary) duty exists, he contends existing authority does not rule out such a theory. For example, although the court in *Huber, Hunt & Nichols, Inc.* v. *Moore* (1977) 67 Cal.App.3d 278, 303-304 [136 Cal.Rptr. 603], discussed the issue and concluded a positive assertion was required under section 1572, subd. (2) and no authority had been cited or found which held the doctrine of negligent misrepresentation applied to *implied* representations, Byrum argues that authority is inapplicable as dicta and as not dealing with facts showing a fiduciary relationship was involved. He points to authority in *Lingsch* v. *Savage* (1963) 213 Cal.App.2d 729, 735-737 [29 Cal.Rptr. 201, 8 A.L.R.3d 537], that nondisclosure of relevant facts in a buyer-seller con-

---

[8]Section 1572, subddivision (2) defines actual fraud, in part, as "[t]he positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true."

Section 1710, subdivision (2) similarly defines deceit in part as "[t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true . . . ."

text may be equated with an implied representation of the nonexistence of the nondisclosed facts, and argues Brand had a duty to investigate and uncover all material facts about the investment, and that a subsequent failure to disclose such undiscovered facts constituted a negligent implied misrepresentation. He thus requests we examine this question as one of first impression in light of the policies underlying the tort of negligent misrepresentation.[9]

Accepting Byrum's invitation, we first note the nature of the several theories alleged in his action. As stated above (pt. I, *ante*), negligent misrepresentation is a claim which may be made in any type of relationship, while recovery for constructive fraud or breach of fiduciary duty is confined to the special kind of relationship which gives rise to special duties of full and complete disclosure of " ' "all material facts *within [the fiduciary's] knowledge* relating to the transaction in question . . . ." ' " (*Main* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc., supra,* 67 Cal.App.3d 19, 32, italics added.) While Byrum has alleged the special fact that he is charging Brand *as a fiduciary* with negligent misrepresentation, we must still distinguish between the two types of causes of action, which are alleged as alternative theories.

Viewed in this light, we think the traditional parameters of negligent misrepresentation theory, as defined by statute, would not have allowed the trial court to instruct the jury as requested. Instead, Byrum's claim for breach of fiduciary duty is adequate to protect his right not to be misled by any omissions by a fiduciary such as Brand. Sections 1572, subdivision (2) and 1710, subdivision (2) govern the law of negligent misrepresentation where there is no allegation of actual *suppression* of fact (see §§ 1572, subd. (3) & 1710, subd. (3)). Those sections (§§ 1572, subd. (2), 1710, subd. (2)) require positive assertions or simply assertions for the statement of a cause of action for negligent misrepresentation, and we see no reason to depart from these statutory requirements that something more than an omission is required to give rise to recovery on that theory, even as against a fiduciary.

---

[9] We are aware of the recently issued decision by another Court of Appeal, *Sefton* v. *Pasadena Waldorf School*■ (Cal.App.), which held an express representation that certain rents were properly chargeable necessarily included and implied a representation that those rents were also legal (not in violation of rent control laws). The court disagreed with the dicta in *Huber, Hunt & Nichols, Inc.* v. *Moore, supra,* 67 Cal.App.3d 278, 304, which stated an implied representation cannot serve as the basis for the positive assertion required to show negligent misrepresentation. We believe the facts in *Sefton* are distinguishable. In *Sefton,* by selling the right to receive the rents, the seller in effect positively asserted there was no legal impediment to receiving them. In our case, as will be discussed, the record does not show Brand positively asserted facts about the unknown aspects of the Hilo investment costs and conditions, but instead disclosed all the factors which he believed were pertinent to an informed decision on the investment. There was a lesser showing here of implied assertions than in *Sefton.*

As already noted (p. 938, *ante*), Witkin has explained that an actual representation is not a required element of a cause of action for breach of fiduciary duty or constructive fraud. However, for a cause of action for negligent misrepresentation, clearly a representation is an essential element. The alleged representation by omission claimed by Byrum seems to us to be too remote to fit this requirement. While Brand may not have uncovered or investigated certain material facts about the investment—i.e., its timing, cost, scope, or necessity for third party contribution, as the material facts were defined for the jury—the record does not show he positively asserted any facts about these factors that were not true, nor actively concealed or suppressed any such facts. Evidently, the jury believed his testimony that he disclosed all the risks of which he was aware, and all the factors which he felt were pertinent to the making of an informed decision. There were apparently no *known* facts which he failed to disclose, from which nondisclosure could be inferred an implied representation that the facts were otherwise. (See *Lingsch* v. *Savage, supra*, 213 Cal.App.2d at p. 736.)[10]

Therefore, the instruction proposed by Byrum, that Brand somehow affirmatively represented the investment was in Byrum's interest by way of his failure to disclose certain material (but unknown) facts, would have required the jury to find that the omissions were implied affirmative representations. We do not think the law of negligent misrepresentation can be stretched so thin, and conclude the cause of action for breach of fiduciary duty affords Byrum an adequate forum for his allegations that Brand's failure to disclose material facts constituted a form of fraud, even if there were no actual intent to deceive. We find no error in the trial court's refusal of Byrum's requested instruction on the element of representation nor in the court's giving of the pattern instruction in its place. (*Grimshaw* v. *Ford Motor Co., supra*, 119 Cal.App.3d at p. 805.)

B

Duties of an "Investment Adviser"

■ Byrum requested, and the trial court refused, three special instructions on the definition, duty, and burden of proof applicable to an "investment adviser," as well as an instruction about the effect of judicially admitted allegations. Each of these was apparently intended to apply to all three

---

[10] For these reasons, we do not find Byrum's citation to Corporations Code section 25401 to be convincing on this point. That section, prohibiting, inter alia, omissions of material facts that should have been disclosed in order to make any statements that were made not misleading, does not address the problem we have here, where the claim is that certain omissions constituted negligent implied misrepresentations, even if the facts not disclosed were unknown to the fiduciary.

of Byrum's causes of action. The first was drawn from Corporations Code section 25009:[11] "A person is an investment advisor if for compensation he engages in the business of advising others, either directly or through writings, as to the value of securities or as to the advisability of investing in, purchasing or selling securities."

The second of these was drawn from a treatise in the field, Marsh & Volk, Practice Under the California Securities Laws (1969) section 13.10[3], page 13-53: "The duty of an investment advisor to a client is that of a fiduciary. An investment advisor is under a duty to disclose fully the nature and extent of any interest that that advisor has and any advice or recommendation the advisor has given to the client, such as compensation that the advisor would receive if the client should act on the recommendation. This means that if an investment advisor, that advisor's employer, or an affiliate will receive fees or other compensation from the sale of securities or other products or services recommended to a client, or if the advisor otherwise has a conflict of interest, the investment advisor must disclose in writing those fees, compensations, and conflicts at the time of entering into a contract or otherwise arranging for the delivery of a financial plan."

The third requested instruction was drawn from section 3372 and set forth the burden of proof applicable to investment advisers: "If a party is engaged in the business of advising others for compensation as to the advisability of purchasing property for investment and represents himself to be an expert with respect to investment decisions in such property, that party shall be liable to the other party who received and relied on such advisory services, and was damaged thereby; unless the party providing the advisory services proves that such services were performed with the due care and skill reasonably to be expected of a person who is such an expert."

Finally, Byrum sought to have the jury instructed as follows about Brand's admission in his answer about his investment advisory activities: "You are required to take as true, that is as an established fact, matters admitted by parties in their pleadings. In this case, defendant has admitted in his pleadings that he 'holds himself out to the public as providing sound investment advice to his clients.'"

Byrum contends the trial court erred in refusing all these instructions because the "overwhelming evidence" showed Brand was an "investment adviser" who acted for compensation, to whom the burden should be

---

[11] Corporations Code section 25009 defines investment adviser at some length, basically as quoted in the proposed instruction, and includes a number of exceptions, such as "(c) a broker-dealer whose performance of these services is solely incidental to the conduct of his business as a broker-dealer and who receives no special compensation for them . . . ."

shifted pursuant to section 3372 to show the services provided met an expert's standard of care regarding the performance of the duty owed. A fair reading of the record discloses that while Brand did not consider himself to be a personal financial consultant to Byrum, he did (grudgingly) admit that in a loose sense, he had acted as Byrum's financial planner. However, we do not find, and the parties have not cited, any specific reference in the record to Brand as an "investment adviser."

The basis of the court's decision to deny all these instructions was its determination that Brand's activities with regard to the Hilo investment fell under an exception to Corporations Code section 25009, in that he was a broker-dealer who received no special compensation for his services. Because the record is equivocal as to whether the Hilo investment was ever conclusively determined to be a security (although instructions on that basis were requested), we asked the parties to address in supplemental briefing the applicability of securities law (Corp. Code, § 25000 et seq.), and hence these instructions.

A close examination of the text of the disputed instructions, however, reveals that regardless of the state of the record on the securities issue, the requested instructions were properly denied because their omission could not have misled or confused the jury such that it is reasonably probable Byrum would have obtained a more favorable result at trial if they had been given. (See *Canavin* v. *Pacific Southwest Airlines, supra,* 148 Cal.App.3d at pp. 523-524.) The current record does not support arguments that Brand had to be characterized as an "investment adviser." We will explain.

In the first place, the instruction drawn from Corporations Code section 25009, defining an investment adviser, merely states such a person advises others as to the value of or advisability of investing in securities. It was not disputed Brand advised Byrum in a professional capacity regarding the value and advisability of the Hilo investment, although the exact nature of that investment was not an issue actively litigated by the parties at trial. As set forth in the first amended complaint, the theories alleged against Brand were framed in common law terms of fraud, negligent misrepresentation, and breach of fiduciary duty, rather than in statutory securities fraud causes of action, even though some references to securities issues were made in Byrum's trial brief and in the unsuccessful motion to amend the first amended complaint (taken off calendar by the de novo settlement judge). (See fn. 5, *ante.*) The jury was given numerous instructions about the fiduciary duty Brand owed to Byrum because of their stipulated confidential relationship, and we do not believe the proposed instruction added anything which would have assisted the jury in determining the duty owed by Brand

and whether he met it. Thus, the evidence did not require this instruction be given regarding any cause of action.

Similarly, with respect to the requested instruction about the duty of an investment adviser, at the outset it merely reiterates what was already stipulated, that Brand had a fiduciary duty to Byrum. The remainder of the proposed instruction had to do with conflicts of interest. Here, the evidence showed Brand received no commissions on the Hilo investment, was an investor himself, and fully disclosed to Byrum and others it was his son Rick Brand who was the instigator of the investment scheme. We fail to see how this instruction on the duty to disclose conflicts of interest is supported or required by the record.

With regard to the proposed instruction on the burden of proof imposed upon investment advisers under section 3372,[12] we first note the evidence showed Brand received no compensation for this particular investment advice, which is one of the threshold requirements for applicability of the section. The trial court made such a finding when it ruled Brand qualified under the exception to Corporations Code section 25009 for broker-dealers who received no special compensation for their services.[13] Thus, with respect to the fraud and negligent misrepresentation claims, the evidence simply did not support the proposed instruction, which accordingly was properly refused. On retrial of the breach of fiduciary duty claim, we cannot speculate whether any additional evidence will be offered to provide more support for this instruction at any further proceedings.

Finally, we examine the appropriateness of the rejected instruction about the effect of Brand's judicial admission that he provided sound investment advice to his clients. As to the fraud-based causes of action, our evaluation of the circumstances of the entire case convinces us the jury received adequate instructions about the duty owed to refrain from fraudulent or

---

[12] Section 3372 is entitled "Investment advisers: Liability; exclusions." The proposed instruction based on this section accurately tracks subdivision (a) of this section, with regard to the duty and burden of proof applicable to those holding themselves out as experts regarding investment property decisions. Subdivision (b)(1) defines the statutory term "expert" as including numerous different categories of financial consultant professionals, such as "financial planner" and "financial consultant" (such as Brand's testimony at trial characterized himself). Subdivision (c) provides certain persons are not liable under the section, including self-dealers (not involved here) and: "(2) Any person . . . licensed under, exempted from licensing under, or not subject to licensing under by reason of an express exclusion from a definition contained in [certain specified state and federal laws governing commodities, corporate securities, insurance, real estate, and banks and savings and loan associations]."

[13] We need not decide the applicability to Brand of the exception in section 3372, subdivision (c)(2) from the coverage of the section for certain professionals licensed under certain other enactments. (See fn. 12, ante.) This is so because we base our decision on the plain language of the proposed instruction, which we find inapplicable to the evidence that was before the jury.

negligent misrepresentations and any breach thereof, so that the proposed instruction would not have made any difference. (See *Henderson* v. *Harnischfeger Corp., supra,* 12 Cal.3d 663.) There was no prejudicial error here.

On the breach of fiduciary duty retrial, subject to the right of the parties after reversal to seek leave to amend their pleadings (see 4 Witkin, Cal. Procedure, *supra,* Pleading, § 408, pp. 456-457), it would appear that since all issues on this theory remain unresolved at this time, the proposed instruction regarding judicial admissions may have a sound basis in law to the extent duty is placed in issue by the parties (for example, if relief is sought and obtained from the stipulation that Brand owed Byrum a fiduciary duty). (See *Razzano* v. *Kent* (1947) 78 Cal.App.2d 254, 259 [177 P.2d 612].) Our opinion on this point, however, is necessarily advisory only, for the reasons explained above.

C

Sufficiency of Evidence: Fraud

We briefly touch upon Byrum's remaining argument on appeal, that the defense verdict on the fraud cause of action was "contrary to all evidence" and thus improper.[14] He contends that because the general purpose of Brand's contacts with Byrum was to sell investments, the jury could not have found on this record that Brand concealed, suppressed, or misrepresented a material fact, but did not do so with the fraudulent intent to induce such an investment. It thus appears Byrum claims no sufficient evidence supports this portion of the judgment. ■ Our standard of review of such a claim is well established: "When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record,* there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. *If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.* [Citations.]" (*Bowers* v. *Bernards* (1984) 150 Cal.App.3d 870, 873-874 [197 Cal.Rptr. 925], original italics.)

---

[14] In light of our reversal of the judgment on the breach of fiduciary duty theory, we need not address Byrum's alternative argument the defense verdict on fiduciary duty was inconsistent with the special verdict on fraud (finding some misrepresentation or concealment had taken place) or with the stipulation and instruction that Brand owed a fiduciary duty to Byrum.

Byrum asks us to hold it would have been impossible from all the evidence for the jury to find that although Brand did conceal, suppress, or misrepresent a material fact about the Hilo investment, he had no fraudulent intent to induce this investment. This we cannot do. Brand repeatedly testified he informed Byrum of all the risks of which he was aware, and of all the factors he felt were pertinent to the making of an informed decision. From this evidence, the jury was entitled to reach a defense verdict on the fraud cause of action, and we will not second-guess its evaluation of the evidence in this regard.

### DISPOSITION

The judgment is reversed as to the breach of fiduciary duty cause of action. The balance of the judgment is affirmed. Each party is to bear his own costs.

Benke, Acting P. J., and Froehlich, J., concurred.